**AMF INCORPORATED, Plaintiff,**

v.

**COMPUTER AUTOMATION, INC., Defendant.**

**No. C–3–81–223.**

United States District Court, S. D. Ohio, W. D.

Feb. 23, 1982.

Gordon H. Savage, Pickrel, Schaeffer & Ebeling, Dayton, Ohio, Gregor F. Gregorich, Rogers, Hoge & Hills, New York City, for plaintiff AMF Inc.

David S. Cupps, Russell P. Herrold, Jr., Scott N. Whitlock, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Benjamin E. King, Buchalter, Nemer, Fields, Chrystie & Younger, Los Angeles, Cal., for defendant Computer Automation, Inc.

## DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO TRANSFER CASE TO UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA; PRETRIAL CONFERENCE SET BY TELEPHONE

RICE, District Judge.

## I. INTRODUCTION

On July 9, 1981, the Defendant, Computer Automation, Inc. ("CAI"), filed a Motion for Change of Venue pursuant to 28 U.S.C. § 1404(a), requesting that the Court transfer the within action to the United States District Court for the Central District of California. In support of that Motion, Defendant has submitted to date five affidavits, several exhibits and documents, and three legal memoranda. Plaintiff, AMF Incorporated ("AMF"), has opposed the mo-

tion for transfer, and has filed eight affidavits, various exhibits, and two legal memoranda. In addition, this matter came on for oral hearing before the Court on September 22, 1981, and accordingly, is appropriate for resolution.

The affidavits and documentary materials submitted by both parties have been carefully studied by the Court, and disclose the following facts:

1. Plaintiff AMF is a New Jersey corporation with its principal place of business in White Plains, New York. Plaintiff is qualified to do business in both Ohio and California[1] (Amended Complaint, ¶ 1; Defendant's Memorandum in Support of Motion for Change of Venue, p. 6);

2. Defendant CAI is a Delaware corporation, qualified to do business in Ohio, with a principal place of business in Irvine, California (Amended Complaint, ¶ 2; Watson affidavit, ¶ 1; Savage affidavit and exhibit attached thereto);

3. Irvine, California, is located within the jurisdiction of the United States District Court for the Central District of California (Watson affidavit, ¶ 1);

4. During all times relevant to the events which form the basis of the present action, AMF, through the AMF Electrosystems Division located in Vandalia, Ohio, was engaged in the manufacture, sale and distribution of computerized cash and inventory control systems, including a type of system known as the Manex 1000 System, which is used in fast-food franchise operations and other restaurants[2] (Amended Complaint, ¶ 5; Mosier affidavit, ¶ 6; Reily affidavit, ¶ 4);

5. CAI is a manufacturer of computer equipment and other related items. In particular, CAI's Naked Mini Division, located in Irvine, California, has as its principal business the manufacture of minicomputers and peripheral devices, and their sale to original equipment manufacturers (Watson affidavit, ¶ 2, ¶ 3);

6. In 1976 and 1977, CAI and AMF entered into written purchase agreements whereby CAI agreed to deliver, and AMF agreed to purchase, CAI minicomputers which were to be incorporated into AMF's Manex 1000 System, an electronic point-of-sale inventory control and accounting system (Amended Complaint, ¶ 6, ¶ 7; Watson affidavit, ¶ 4);

7. After the minicomputers had been delivered by CAI, AMF used them as components in Manex 1000 Systems, which were installed in Victoria Station and Red Lobster restaurants located throughout the United States (Amended Complaint, ¶ 9; Watson affidavit, ¶ 5); Stewart affidavit, ¶ 3);

8. Beginning approximately in August, 1977, and continuing thereafter, AMF customers, Red Lobster and Victoria Station, began experiencing difficulties with the Manex 1000 Systems[3] (Amended Complaint, ¶¶ 10, 11; Stewart affidavit, ¶ 3);

9. The majority of the computers involved in this case were designed, manufactured, assembled, inspected, and tested at CAI's main manufacturing plant in Irvine, California (supplemental Watson affidavit, ¶ 4, ¶ 8);

10. Most, if not all of the CAI minicomputers and components were delivered to AMF in Vandalia, and were tested and incorporated there into the Manex 1000 System. In addition, failed, worn, and defective parts were returned to Vandalia. (Mosier affidavit, ¶ 6; Reily affidavit, ¶ 4; Stewart affidavit, ¶ 4);

11. After problems developed with the Manex 1000 Systems[4], inspections were organized in 1978 for eleven stores in the

---

**1.** AMF has not disputed that it is qualified to do, or is doing business in California.

**2.** These facts have not been disputed by Defendant.

**3.** Obviously, the source of these difficulties is a disputed issue in this lawsuit (Watson affidavit,

¶ 6). There does not appear to be any question that problems were encountered after installation of the Manex 1000 Systems (Mosier affidavit, ¶ 10 a, b, c; Watson affidavit, ¶ 7b, ¶ 8; Koontz affidavit, ¶ 7).

**4.** *See* footnote 3, *supra*.

restaurant chains of the two major AMF customers, Victoria Station and Red Lobster.[5] Three of the Victoria Stations are located in California; the rest are located in widely divergent locations, such as Utah, Michigan, Texas, Ohio, and Massachusetts. The Red Lobster restaurants which were inspected are all located in Florida (see, citations to finding 10; Stewart affidavit, ¶¶ 11, 12; Reily affidavit, ¶ 2);

12. During 1978 and 1979, various CAI personnel met with AMF officials or employees in Vandalia, Ohio. AMF sent an independent consultant to Irvine during the course of the project to analyze the procedures and processes followed at that facility (Reily affidavit, ¶ 7; Mosier affidavit, ¶ 10 a-g; Watson supplemental affidavit, ¶¶ 8, 9);

13. AMF operated two businesses through its Electrosystems Division in Vandalia, Ohio: an aircraft, aerospace, and vehicular power equipment business, and an electronic point-of-sale systems business, in which the Manex 1000 Systems were manufactured. In June, 1978, AMF sold the power equipment business to Leland Electrosystems, Inc. AMF retained the electronic point-of-sale business, but in September, 1978, entered into an agreement with TRW, Inc., an Ohio corporation, whereby TRW contracted to perform maintenance services for *inter alia*, the Manex product line. The agreement with TRW provided that AMF would continue to furnish TRW with products required for maintenance. In addition, upon TRW's exercise of an option to take a non-exclusive license to sell and service Manex products, certain royalty fees were to be paid to AMF. TRW is presently selling Manex 1000 Systems pursuant to its agreement with AMF (Ware affidavit, ¶¶ 2, 3; Heath affidavit, ¶¶ 2, 3, 5; Woodruff affidavit, ¶ 3);

14. The AMF power business was purchased by Leland Electrosystems, Inc., a Delaware corporation which applied to do business in Ohio on May 30, 1978. At approximately the same time, another corporation, QBS, Inc., was formed for the purpose of entering into a systems manufacturing agreement with AMF so that Leland would be sheltered from the liabilities of the AMF systems business. QBS, Inc., acquired some inventory of the systems business, but AMF retained its machinery, equipment, and good will. From June 20, 1979 to December 20, 1979, QBS, Inc., made Manex 1000 Systems on behalf of AMF. Since at least May, 1980, QBS, Inc. has manufactured Manex 1000 Systems for TRW pursuant to the Service Agreement entered into by AMF and TRW.[6] (Ware affidavit, ¶¶ 2, 4, 5, 6; Woodruff affidavit, ¶¶ 2, 3; exhibits D and E attached to Defendant's Final Memorandum in Support of Motion for Change of Venue);

15. Other than the remaining business relations outlined in findings thirteen and fourteen, the only Ohio business operated by AMF subsequent to the AMF Electrosystems sale has been an unincorporated division known as AMF Bowling Division-U.S. That AMF division operates a manufacturing plant in Shelby, Ohio, with a work force of 221 persons, and maintains offices and engineering laboratories in Westerville, Ohio, with a total employment of approximately 41 persons.[7] (Johnson affidavit, ¶¶ 3, 4);

16. A view of the Manex 1000 System in operation may be had either in Dayton, or in the Central District of California, within the same approximate distance from each

5. While there is a conflict in the affidavits with regard to the severity of the Red Lobster problem, *compare*: Stewart affidavit, ¶ 3 with Koontz affidavit, ¶ 9, and with Watson supplemental affidavit, ¶ 2, Defendant apparently does not dispute the fact that eleven test sites were established for each restaurant chain, and were subjected to an inspection during similar time spans in 1978 (Stewart affidavit, ¶ 11, ¶ 12; Reily affidavit, ¶ 3).

6. The properly documented materials submitted to the Court do not indicate precisely when TRW, Inc. exercised its licensing option under the TRW–AMF Service Agreement. Therefore, the Court has utilized the May, 1980 date contained in the Woodruff affidavit.

7. Shelby, Ohio is not in this judicial district; Westerville, Ohio is in the Southern District of Ohio. *See*: Ohio Legal Directory, pp. 63, 141, 142 (1980); S.D.Ohio R. 2.1.1.

federal court. (Stewart affidavit, ¶ 9; Watson supplemental affidavit, ¶ 21);

17. Most of the AMF documents relevant to this action are located in Vandalia, Ohio, in the Southern District of Ohio. All of the CAI documents pertinent herein are located in Irvine, California, in the Central District of California (Stewart affidavit, ¶ 7; Reily affidavit, ¶ 6; Mosier affidavit, ¶ 9; Thompson affidavit, ¶¶ 1–38; Watson supplemental affidavit, ¶ 17);

18. Section 12 of the Purchasing Agreement signed by AMF and CAI specifies that "[t]his agreement shall be governed by the laws of California." (exhibit C attached to Amended Complaint; Defendant's Memorandum in Support of Motion to Transfer, p. 13; Plaintiff's Reply Memorandum in Opposition to Defendant's Motion to Transfer);

19. In May, 1978, AMF was sued by Victoria Station, in California, for *inter alia,* breach of a purchase and option agreement involving approximately 100 electronic point-of-sale systems. On January 6, 1981, a request for dismissal, with prejudice, was filed in that action by the attorney for Victoria Station (King affidavit, ¶ 2; Complaint attached to King affidavit, pp. 1, 2, 3; Request for Dismissal attached to King affidavit).

Having culled the above facts from the affidavits and exhibits which were submitted by the parties, the Court will next consider whether transfer to the Central District of California would be appropriate in view of the legal principles governing transfer requests. In order to begin, the Court will first briefly discuss the general law applicable to § 1404(a) motions.

## II. DISCUSSION OF LAW

As was previously indicated, the Defendant has requested that the Court transfer the within action to the Central District of California. 28 U.S.C. § 1404(a) provides, with respect to a change of venue, that:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

According to the Supreme Court, the threshold consideration in ruling upon a § 1404(a) transfer motion is whether the action is one which could have been brought initially in the proposed transferee district. *Continental Grain Co. v. F.B.I.–585,* 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960). 28 U.S.C. § 1391 provides that:

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

Applying this statute to the facts set forth above, the Court concludes that the present litigation could have been commenced either in Dayton, where the Plaintiff is doing business, and thus resides,[8] or in the Central District of California, where the Defendant resides.

In determining whether a § 1404(a) request should be granted, *Norwood v. Kirkpatrick,* 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789 (1955) indicates that the factors consistently applied in *forum non conveniens* cases should be utilized, except that a lesser showing of inconvenience may be required. *Id.* at 32, 75 S.Ct. at 546. *See also: Mead Corp. v. Oscar J. Boldt Construction Co.,* 508 F.Supp. 193, 197 (S.D.Ohio 1981) (*Mead*). The Supreme Court in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (*Gulf Oil*), indicated the following criteria to be pertinent in a *forum non conveniens* decision:

An interest to be considered and the one most likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of

---

**8.** Although Plaintiff has sold most of the AMF assets, it has retained some business contacts in this district, with TRW, Inc., *see,* findings 13 and 14, and does maintain other business operations in this district. *See,* finding 15, and footnote 7, *supra.* In addition, the claim arose in this district.

unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive. . . .

. . . .

Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. . . . There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* at 508–509, 67 S.Ct. at 843. Accordingly, in ruling upon the within motion, the Court will address each of the above categories separately, and in so doing, will consider the arguments advanced by each of the parties.

## III. PRIVATE INTEREST OF LITIGANTS

### A. *Documentary Evidence*

■ Defendant has submitted a lengthy affidavit (Doc. # 15, affidavit of Richard Thompson), and forty-eight photographs of various file cabinets (exhibit C attached to Doc. # 15), in support of its contention that transfer herein is warranted because a substantial majority of the documents and computers which will need to be examined are located in Southern California. In response, Plaintiff has filed an affidavit indicating that most of the pertinent AMF documents, including, *inter alia*, files describ-

ing computer failures, quality assurance records, and statistical data concerning computer operations and failures, are located in Vandalia, Ohio, in this judicial district. The Court has analyzed all materials presented, and has concluded that the location of documentary materials does not furnish justification for transfer. Given the existence of relevant records in this district as well as in California, the inconvenience would appear to be equally divided, thus precluding transfer. *Raymond E. Danto Associates, Inc. v. Arthur D. Little, Inc.*, 316 F.Supp. 1350, 1358 (E.D.Mich.1970).

In reaching this conclusion, the Court has given consideration to Defendant's assertion that it will have to search or review millions of documents located in Irvine, California (Watson supplemental affidavit, ¶ 17; Thompson affidavit, ¶ 3), and that large numbers of files, pictured in exhibit C, provide the source material for answering Plaintiff's discovery requests [9] (Thompson affidavit, ¶¶ 2, 5–37; exhibit C attached to Thompson affidavit). With respect to these contentions, the Court finds the amount of documents reviewed, or anticipated to be reviewed, to be an irrelevant consideration in connection with a transfer motion, since regardless of trial location, the same files and documents will have to be examined. *See, Borden, Inc. v. Texaco, Inc.*, 526 F.Supp. 1291, at 1295 (S.D.Ohio, 1981) (holding number of documents reviewed, and time spent in reviewing process, irrelevant to transfer determination). As a final point with regard to documentary evidence, the Court notes that Defendant's expressed fear of the business disruption which would be caused by the necessity of sending original documents to Ohio for long periods of time (Doc. # 7, p. 5; Doc. # 18, pp. 19, 25), should be eased by Plaintiff's stipulation (Doc. # 25, pp. 3–4), that Defendant may use copies in lieu of originals wherever necessary. *Zorn v. Anderson*, 263 F.Supp. 745, 749 (S.D.N.Y.1966).

---

**9.** The Court has not, however, considered Defendant's claim that Plaintiff's listed Vandalia documents do not appear to be voluminous because they comprise only ten *types* of files (Watson supplemental affidavit, ¶ 17). To the

extent that such an argument involves speculation, and would moreover reduce transfer litigation to nothing more than a "filing cabinet" battleground, it is not appropriate.

B. *Witnesses*

As was previously noted, the Supreme Court in *Gulf Oil, supra,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), indicated that factors to be considered in ruling upon a *forum non conveniens* motion should include the availability of compulsory process to obtain the attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses. *Id.* at 508, 67 S.Ct. at 843. In addition, § 1404(a) indicates that transfer may be granted for the convenience of witnesses. In the present case, both parties have submitted affidavits indicating that they intend to call various witnesses who are not employees of either party, and who, regardless of the location of trial, will not be subject to the subpoena of the district court involved. In addition, Defendant and Plaintiff have submitted affidavits indicating that certain witnesses, both employee and non-employee, will be inconvenienced if trial is held in Dayton, or in California, respectively.

This Court has previously required the submission, in connection with § 1404(a) requests, of lists of anticipated witnesses, together with an indication of the material matters about which the witnesses are expected to testify. *Borden, Inc. v. Texaco, Inc.,* 526 F.Supp. 1291, at 1293 (S.D.Ohio, Feb. 19, 1981), citing, *inter alia, Plum Tree v. Stockment,* 488 F.2d 754 (3d Cir. 1973). In this regard, Defendant has filed the affidavit of Gordon Watson, the Vice-President and General Manager of the Defendant's Naked Mini Division, which lists the names of various witnesses, and in very general terms, those matters about which they may be expected to testify (Watson affidavit, ¶¶ 1, 8). In response, Plaintiff has submitted the affidavit of Dean Reily, the Director of Engineering at AMF Electrosys-

tems in Vandalia during the time relevant herein, which discusses the potentially relevant witnesses and testimony anticipated on behalf of AMF. After consideration of all matters presented, the Court has concluded, for several reasons, that Defendant has not established that transfer on grounds related to witnesses would be appropriate.

First, the Court notes that although Defendant has stated that eleven former employees of CAI might be expected to testify in the trial of this action, there is no indication that any of these witnesses have *refused* to attend trial in Dayton. *Cf: Oglebay Norton Co. v. Bradley Transportation Line, Michigan Limestone Division, United States Steel Corp.,* 197 F.Supp. 443, 445–446 (N.D. Ohio 1961) (permitting transfer where a showing had been made that three vitally important witnesses refused to travel to the district in which suit was pending). Likewise, Plaintiff has not submitted evidence that any of its non-employee witnesses have refused to travel to California for trial. Thus, because there is no indication that compulsory process would be required to compel the attendance of any witnesses for either party, the Court does not find its availability in either Dayton or California to be a relevant consideration herein.

Assuming *arguendo* that the availability of compulsory process had been placed before the Court as a pertinent issue, it does not appear that transfer on that basis would be appropriate, since *both* Plaintiff and Defendant have indicated that they intend to call non-employee witnesses at trial, who cannot be compelled to testify regardless of which forum is chosen.[10]

The only non-employee witness of Defendant who can arguably be placed within the category of requiring compulsory proc-

---

**10.** In addition to the non-employee witnesses listed in ¶ 8 of the Watson affidavit, Defendant has indicated that it intends to call witnesses employed by Victoria Station who would not be subject to the subpoena power of this Court, but would be subject to the subpoena power of the U. S. District Court for the Central District of California. Given Defendant's failure to identify any of these potential witnesses, or the material matters about which they are expect-

ed to testify, *see, Holiday Rambler Corp. v. American Motors Corp.,* 254 F.Supp. 137, 139–140 (W.D.Mich.1966) (denying transfer where such a showing had not been made), it would be an unwarranted exercise in speculation for this Court to conclude that transfer should be granted on the basis of Defendant's desire to present testimony or obtain documents from Victoria Station personnel.

ess,[11] would be Joseph Koontz, who has submitted an affidavit indicating that traveling to Ohio would cause substantial hardship to his present employer (Koontz affidavit, ¶ 2, ¶ 10). Again, it must be emphasized that there has been no showing made that Koontz would refuse to testify, and thus, transfer cannot be premised on that speculative basis. While Koontz's testimony appears to be relevant, based on the limited information submitted to the Court, should Koontz refuse to attend trial, his testimony could be presented by way of deposition. *Mead, supra,* 508 F.Supp. 193, 199 (S.D.Ohio 1981).

■ Defendant has argued, however, that transfer should be accorded where fraud claims are involved, in order that the trier of fact may have the opportunity, afforded by live testimony, of weighing credibility. It is true that the advantage of presenting live testimony in a fraud case has been considered to be a relevant factor in determining the appropriateness of transfer. *See, Oil & Gas Ventures-First 1958 Fund, Ltd. v. Kung,* 250 F.Supp. 744, 756 (S.D.N.Y.1966) (denying transfer in action alleging fraudulent conduct, where, *inter alia,* Plaintiff would be disadvantaged by the potential loss of the live testimony of a vital witness). In the present case, as previously noted, there is no indication that Koontz has refused, or will not testify at the trial of this action. Of even more significance, there is no indication that his testimony is material to the fraud issue.

The only indication from Defendant of the possible relevance of Koontz's testimony is contained in the Koontz affidavit, wherein it is stated that the memories he designed utilized the 2905 transistors referred to by Plaintiff (Koontz affidavit, ¶ 6). This reference is not entirely clear, but the Court assumes that it is to the Fourth Claim of the Amended Complaint filed by Plaintiff, which makes mention of 2905 Quad Pack transistors. In that portion of the Amended Complaint, which seeks recovery on the basis of fraud, Plaintiff alleges that in 1977, Defendant discovered that 2905 Quad Pack transistors were defective or overrated, were a principal cause of computer failures in the CAI Minicomputers, and could be readily replaced by other transistors of suitable design capacity (Amended Complaint, ¶ 33). The Plaintiff further alleges that despite Defendant's knowledge, Defendant continued to represent that the 2905 transistors were suitable, and continued to install them in the new and repaired Minicomputers supplied to Plaintiff (Amended Complaint, ¶ 34). Koontz's testimony on this point may be relevant, but there is no indication in the information which has been furnished to the Court by Defendant, that Koontz was the only CAI employee who participated in transactions involving the 2905 transistors, or in fact, that he participated at all, beyond what may be inferred from ¶ 6 of his affidavit, i.e. by originally using the 2905 transistors in the Minicomputer memories.[12] Since there are

---

11. There are indications in the Watson affidavit that another non-employee, Michael Smith, would consider it a hardship to attend trial in Dayton (Watson affidavit, ¶ 9). [The statement in the Koontz affidavit concerning his belief that hardship would be caused to other former CAI-employees in the event of a trial in Dayton (Koontz affidavit, ¶ 10), has been disregarded by the Court because it is conclusory in nature, and does not contain underlying factual data. *Texas Gulf Sulphur Co. v. Ritter,* 371 F.2d 145, 148 (10th Cir. 1967).] Assuming *arguendo* that compulsory process would be required, the testimony of Smith, to the extent that it is disclosed by Defendant's generalized description of anticipated testimony, appears to be cumulative of that which could be given by non-employees Snyder, Davis, and Wyatt, and present CAI employee Richard Thompson, all of whom

were members of a team formed by CAI to handle the problems raised by AMF (Koontz affidavit, ¶ 7, ¶ 8; Watson affidavit, ¶ 8).

12. In fact, to the extent that any inference can be drawn from the incomplete information before the Court, it would be that Koontz informed Plaintiff in late 1977 that there was a problem with the 2905 transistors, and that the alleged misrepresentation which forms the basis of the Fourth Claim for Relief, i.e. that the computer failures were caused by excessively tall stiffeners, was made by another CAI employee, Richard Davis (Amended Complaint, ¶ 36; Mosier affidavit, ¶ 10 a-c). Thus, the crucial testimony regarding the fraud allegations would appear to be that of Davis, and possibly that of Richard Thompson, who was with Davis on the date of the alleged misrepre-

no allegations of fraud regarding this original use of the 2905 transistors, Koontz's testimony on this point may furnish background information, but may not be material to the Defendant's liability, if any, for fraud. Given the fact that Defendant has failed to demonstrate that Koontz will be unable to testify, or that his testimony is material to the issue of fraud, the Court cannot conclude that transfer is warranted on the basis of Koontz's testimony. In this context, it should be emphasized that it is incumbent upon the party moving for transfer to provide information concerning the materiality of the testimony of witnesses. *Mendelson v. Fleischmann*, 386 F.Supp. 436, 439 (S.D.N.Y.1973); *cf: Aetna Casualty and Surety Co. v. Singer General Precision, Inc.*, 323 F.Supp. 1141, 1144 (D.Del. 1971) (holding that where inconvenience of witnesses is alleged on transfer motion, record must contain information regarding, *inter alia*, materiality of witnesses to case).

In addition to the factors just discussed, there is a further reason why transfer would not be appropriate, even assuming Koontz's refusal to testify. Plaintiff has submitted the affidavit of Joel Stewart, a former AMF employee, which indicates that traveling to California would impose hardship upon Stewart and his present employer, Victoria Station (Stewart affidavit, ¶ 10). To the extent that the Court has assumed inability to obtain testimony with regard to Koontz, a similar assumption must be made for Stewart, who has alleged hardship tantamount to that asserted by Koontz. Insofar as Stewart's role in analyzing the information stored in computer memories does not appear to be duplicated by the other witnesses listed by Plaintiff (Reily affidavit, ¶ 8), his testimony appears to be at least as relevant as that of Koontz, and non-cumulative as well.[13] Finally, assuming that the testimony of Koontz and Stewart is equally material, transfer would not be warranted since it would do nothing more than shift inconvenience from the Defendant to the Plaintiff.[14] In such a situation, transfer is inappropriate. *Microtran Co., Inc. v. Midcom, Inc.*, 414 F.Supp. 1103, 1105 (E.D.N.Y.1976).

■ Based on the foregoing analysis, which indicates that transfer is not required to compel the attendance of witnesses, and would merely shift inconvenience from Defendant's witnesses to Plaintiff's, the Court concludes that transfer of this action to the Central District of California is not merited on the basis of factors related to witness availability or convenience.

■ Defendant has also claimed that it will be financially burdened by the cost of transporting witnesses to Dayton, while transportation of Plaintiff's witnesses to

---

sentation, and who is still employed by CAI (Mosier affidavit, ¶ 10 c, d; Watson affidavit, ¶ 8).

**13.** Defendant has indicated that Stewart's testimony is both relevant and non-cumulative. *See*, Doc. # 18, pp. 35–56.

**14.** It can also be assumed that attendance at trial in a distant judicial district will inconvenience any witness, whether he is an employee of a party, or not, if only from the standpoint that travel to a location away from one's home involves some disruption of ordinary routine. Even given this factor, transfer would merely shift inconvenience to Plaintiff's witnesses, since none of them live in California. Rather, all of the listed witnesses of Plaintiff live either in Ohio, or in areas which are substantially nearer to this judicial district than to California. (Reily affidavit, ¶¶ 8, 9a, b, 10, 11, 12). Defendant has argued that the testimony of the Ohio witnesses, in particular, is either cumulative, or related to damages rather than the more important issue of liability. (Doc. # 18, p. 36). While the testimony of certain witnesses appears to be cumulative, i.e., that of Sims, Butchowski, Comer, Sherman, Jones, Justice, Shuman, and perhaps Baldassarre, the testimony of the remaining six individuals appears to be material to the establishment of Plaintiff's case. *See*, Reily affidavit, ¶ 8). Given this factor, as well as the inconvenience alleged by Mosier, the former President of AMF, who is now located in a state neighboring this judicial district (Mosier affidavit, ¶ 2, ¶ 4), and the fact that the testimony of Defendant's potential witnesses has not been adequately detailed, *see*, Watson affidavit, ¶ 8, wherein seven of the eleven non-CAI employees are listed without any individualized description of their former positions or the nature of their anticipated testimony, the Court cannot conclude that transfer on the basis of witness inconvenience would be appropriate.

California will be only slightly more inconvenient for Plaintiff than litigating in this district. Defendant has further contended that because AMF is a nationally and foreign based corporation, with extensive financial resources, it is better able to absorb any costs caused by transfer. In ruling upon a transfer motion, it is appropriate to consider the relative financial status of the parties, *Aamco Automotive Transmissions, Inc. v. Bosemer*, 374 F.Supp. 754, 757 (E.D. Pa.1974), and where retention of the action in the transferor forum would effectively preclude a party from defending the suit, transfer has been granted. *Id.* at 757–758. *See also: Goldstein v. Rusco Industries, Inc.*, 351 F.Supp. 1314, 1318 (E.D.N.Y.1972) (Goldstein).

The information which has been submitted regarding the relative financial worth of the parties is sparse, but does indicate that for the period ending on December 30, 1980, AMF's net worth was approximately 447 million dollars, while as of June 30, 1980, CAI's net worth was approximately 26.496 million dollars (Watson affidavit, ¶ 7(g)). AMF appears to conduct business both throughout the United States,[15] and in foreign countries such as, *inter alia*, Canada, France, and Mexico (Doc. 29, exhibit A), and has previously been involved in litigation in San Francisco with Victoria Station (Complaint for Damages attached to King affidavit). While CAI's home office is located in Irvine, California, it also maintains repair service centers in New Jersey, Illinois, and Texas, and a supplemental manufacturing facility in Dallas, Texas.[16] (Reily affidavit, ¶ 13; Watson Supplemental affidavit, ¶¶ 7, 8). In addition, CAI has conducted business in Columbus, Ohio, Indianapolis, Indiana, Michigan, and Georgia (Reily affidavit, ¶ 17), and has recently participated in litigation in the U. S. District Court for Northern Illinois

(Watson Supplemental affidavit, ¶ 22; exhibit A attached to Watson Supplement affidavit).

On the basis of the foregoing information, it appears that *both* Plaintiff and Defendant have substantial corporate assets, and conduct business in various parts of the United States. Given these factors, as well as Defendant's failure to illustrate that it will sustain "more harm than that suffered by any defendant sued in a forum not of his own choosing," *Goldstein*, 351 F.Supp. at 1319, the Court cannot conclude that the cost to Defendant of litigating the present action in this forum furnishes a reason for transfer. In this context, it should be emphasized that Defendant's original choice to transact business in a forum distant from its main office detracts somewhat from its present unsupported allegations of financial burden. *See, Country Maid, Inc. v. Haseotes, Inc.*, 312 F.Supp. 1116, 1118 (E.D.Pa. 1970) (finding that defendants' initial decision to conduct substantial activities in area removed from corporate headquarters prevented them from attaching compelling significance to that fact in moving for transfer).

Defendant has additionally contended that trial in Dayton represents maximum inconvenience for Defendant, while Plaintiff will only be slightly more inconvenienced by being required to transport its witnesses, many of whom must already be transported to Dayton, to California. Without reiterating at length those facts which have previously been discussed, the Court notes that many witnesses, whose testimony has been demonstrated by Plaintiff to be relevant, are located in Dayton, Ohio. *See,* footnote 14, *supra*. In addition, AMF's documentary material is located in this judicial district. While certain witnesses will have to be transported to Dayton, all of the

---

**15.** The information submitted thus far indicates that AMF is located, or has subsidiaries in Virginia, Indiana, Florida, and Wisconsin (Reily affidavit, ¶¶ 9(b), 10, 11, 20).

**16.** There is some dispute with regard to the extent of the involvement of the Defendant's New Jersey, Illinois, and Texas service centers

in the Manex 1000 System repairs. *Compare,* Reily affidavit, ¶ 13 with Watson supplemental affidavit, ¶¶ 7, 8). It does appear that of the two hundred computers ordered by AMF, approximately thirty were shipped from the CAI Texas manufacturing facility (Watson supplemental affidavit, ¶ 7).

potential listed witnesses reside either in the midwest, or on the east coast of the United States (*see*, Reily affidavit, ¶¶ 9a, b, and c, 10, 11, 12). Thus, travel to Ohio would be more convenient both in terms of travel time, and loss of work time, than would travel to California. The Court recognizes that trial in Dayton is inconvenient for Defendant, but it is not permissible under § 1404(a) to transfer to a forum which is equally convenient, or more inconvenient. *Van Dusen v. Barrack*, 376 U.S. 612, 645–646, 84 S.Ct. 805, 823–824, 11 L.Ed.2d 945 (1964) (*Barrack*). Moreover, transfer is not appropriate where it would merely shift inconvenience to the other party. *Mead, supra*, 508 F.Supp. 193, 199 (S.D. Ohio 1981). *See also: Microtran Co., Inc. v. Midcom, Inc.*, 414 F.Supp. 1103, 1105 (S.D. N.Y.1976). Therefore, because transfer of the present action to the Central District of California would, while lessening Defendant's inconvenience, place substantial inconvenience upon Plaintiff, the Court cannot conclude that the cost of transporting witnesses furnishes justification for transfer.

### C. *View of the Premises*

■ As was mentioned earlier, the Supreme Court in *Gulf Oil, supra*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), stated that a factor to be considered in ruling upon a *forum non conveniens* motion is the "possibility of view of premises, if view would be appropriate to the action." *Id.* at 508, 67 S.Ct. at 843. Defendant has contended that a view of its manufacturing facility in Irvine, California would be appropriate, because Plaintiff has placed Defendant's entire manufacturing process at issue. Defendant has, however, failed to submit any facts which support the need for a view, beyond the bare assertion that a view would be necessary in order to demonstrate the manner in which Defendant's complicated manufacturing and quality control procedures were planned and executed

(Watson supplemental affidavit, ¶ 6). The Court is unable to see why testimony regarding this matter would not more than adequately suffice to apprise the jury of the nature of Defendant's manufacturing process. A similar argument regarding the necessity of a jury view was made in *Southeastern Equipment Co. v. Union Camp Corp.*, 498 F.Supp. 164 (S.D.Ga.1980), wherein the Defendant claimed that a jury view of its facilities might be required in order for the jury to understand the circumstances of its alleged negligence. *Id.* at 165. The Court rejected this contention, finding that while "jury views may be useful in certain unusual cases, photographs and diagrams can most often achieve the same ends." *Id.* In the within case, this Court does not find anything which distinguishes the asserted claims from those presented by the ordinary breach of contract or negligence action, and further, does not find any indication that testimony, or diagrams will not provide sufficient guidance for the jury. In this context, the Court particularly notes that other courts have required that the party moving for transfer furnish either facts or supporting reasons indicating why a view would be necessary. *See, Marbury-Pattillo Construction Co., Inc. v. Bayside Warehouse Co.*, 490 F.2d 155, 158 (5th Cir. 1974) (upholding denial of transfer where defendant had not given supporting reasons indicating a view would be necessary in the interests of justice); *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 447 F.Supp. 381, 384 (N.D.Okl.1978) (overruling transfer motion where court had not been provided with facts sufficient to indicate that view would be necessary to the ends of justice). Therefore, the Court is unable to conclude that the location of Defendant's manufacturing facility in California, and the possibility of a view thereof, furnish support for a transfer of the within action to the Central District of California.[17]

---

17. Both parties have agreed that a view of the Manex 1000 System in operation may be desirable (Doc. # 13, p. 28; Doc. # 18, pp. 4, 44). However, because the Manex 1000 System may be viewed in either judicial district in which venue is appropriate, *see*, finding 16, and affidavits cited therein, the possibility of a view of the Manex 1000 System is not a factor supporting transfer.

## IV. PUBLIC INTEREST

Defendant has maintained, finally, that other factors, such as the necessity of applying California law, and the relative docket congestion in this district, as opposed to the Central District of California, require that transfer be granted in the interests of justice. Plaintiff has responded by arguing that Ohio law should be applied to most, if not all of the causes of action involved herein, and by contending that trial in this district will, in fact, occur as quickly as in California.

■ In *Fannin v. Jones*, 229 F.2d 368 (6th Cir.), *cert. denied*, 351 U.S. 938, 76 S.Ct. 834, 100 L.Ed. 1465 (1956), the Court of Appeals for this Circuit noted that:

A court should not under § 1404(a) look to docket conditions in order simply to serve the court's own convenience.... A prompt trial, however, is not without relevance to the convenience of parties and witnesses and in the interest of justice.

*Id.* at 369 (citations omitted). The clear import of these statements is that transfer is not appropriate merely to ease a court's own calendar congestion, but may be considered if it would permit the parties to enjoy a more expeditious trial. In the present case, based on statistics compiled by the Administrative Office of the United States Courts, trial in this district would probably be achieved within a substantially shorter time than in the Central District of California. For example, statistics for the twelve-month period ending June 30, 1981, indicate that the median time between filing and disposition by trial, of civil cases, was twenty-five months in the Southern District of Ohio, while in the Central District of California, the median time was thirty-one months. 1981 Ann. Report of

the Director, at 30 app. (Administrative Office of the United States Courts). Consequently, because it appears that transfer would *inconvenience* all litigants by potentially increasing the duration of this litigation, the difference in disposition time between this district and the transferee district cannot be viewed as a factor weighing in favor of transfer.[18]

As noted above, Defendant has contended that California law, rather than Ohio law, must be applied to the resolution of Plaintiff's claims, and that therefore, because a California court would have greater familiarity with the relevant state law, transfer to the Central District would be appropriate. Plaintiff has responded by arguing that Ohio law must be applied herein, and that, consequently, this action should remain in Ohio.

■ The Supreme Court in *Gulf Oil, supra*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), did indicate that:

There is an appropriateness too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* at 508, 67 S.Ct. at 843. Lower courts, in ruling upon § 1404(a) motions, have accorded slightly different weight to this factor. *Compare: Atlantic Richfield Co. v. Stearns-Roger, Inc.*, 379 F.Supp. 869, 872 (E.D.Pa. 1974) (according little weight to the fact that foreign law controls disposition of the case); *Vassallo v. Niedermeyer*, 495 F.Supp. 757, 760 (S.D.N.Y.1980) (holding that applicability of foreign law is accorded slight weight, particularly where no complex questions of foreign law are involved); *Raymond E. Danto Associates, Inc. v. Ar-*

---

18. The factor of docket congestion should probably not be given significant emphasis, in view of the fact that statistics may fluctuate from year to year. For example, information submitted by Plaintiff indicates that for the twelve month period of time ending June 30, 1980, the median time between filing and disposition by trial, of civil actions, was twenty-three months for the Southern District of Ohio, as compared

to twenty-two months for the Central District of California (Doc. # 13, exhibit A). Only one year later, however, as noted in the main text, the median time for California trials had increased by nine months. Even on the basis of the 1980 information, transfer would not have been warranted, since a difference of only one month cannot be viewed as particularly significant.

thur *D. Little, Inc.*, 316 F.Supp. 1350, 1358 (E.D.Mich.1970) (holding that necessity of applying foreign law should be given some weight in transfer motion, but will not be sufficient to warrant transfer unless complex questions of substantive law or of conflicts of law will arise); *Hall v. Kittay*, 396 F.Supp. 261, 265 (D.Del.1975) (expertise in relevant state law is a factor to be considered, but even uncertainty of law is not conclusive of a transfer motion); *Artisan Development, Division of Kaiser Aetna v. Mountain States Development Corp.*, 402 F.Supp. 1312, 1316 (S.D.Ohio 1975) (familiarity with relevant law is a factor but is not controlling).

In *Barrack, supra*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), the Supreme Court discussed the pertinence of considering the applicable law in ruling upon transfer motions. In *Barrack*, the district court had granted transfer, for reasons of convenience, *id.* at 629, 84 S.Ct. at 815, but had also noted that the applicable state law of the transferor forum was unsettled. *Id.* at 645, 84 S.Ct. at 823. The Supreme Court

reversed, and remanded the case to the district court, finding that:

> [T]his uncertainty, however, should itself have been considered as a factor bearing on the desirability of transfer.... We do not suggest that elements of uncertainty in transferor state law would alone justify a denial of transfer, but we do think that the uncertainty is one factor, among others, to be considered in assessing the desirability of transfer.

*Id.* at 645–646, 84 S.Ct. at 823–824. Thus, under *Barrack*, it appears that the relevant state law is a factor to be considered in ruling upon transfer requests. Even where the pertinent state law appears to be unclear or unsettled, however, transfer will probably not be warranted on that basis alone.

In the present case, for the purpose of analyzing the strongest possible argument for transfer, the Court has assumed that California law applies to the resolution of all of the claims advanced by Plaintiff.[19] However, even given that assumption, there is no reason why this action need be transferred to California, since Defendant has

---

19. This assumption, i.e. that California law governs this action, has made it unnecessary to determine, at this point, which state law is applicable herein. As Plaintiff has suggested, *see* Doc. # 25, p. 7, a dispositive resolution of the state law question is presently somewhat premature, particularly in light of the fact that Defendant has not yet filed an answer in this action. However, it is very possible that Ohio law may govern the tort claims which have been presented by Plaintiff. Under *Klaxon Co. v. Stentor Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), this Court is required, in a diversity action, to apply the conflict of law principles of the forum in which it sits. With regard to tort actions, Ohio has traditionally applied the rule of *lex loci delicti*, or the place of the injury, but has refused to apply that doctrine automatically. *Schiltz v. Meyer*, 29 Ohio St.2d 169, 171–172, 280 N.E.2d 925, 926–927 (1972). Instead, Ohio Courts have permitted the general application of the doctrine to be tempered by considerations of public policy, such as a party's selection of the forum, and the governmental interest, if any, of the competing states. *Id; See also, Moats v. Metropolitan Bank of Lima*, 40 Ohio St.2d 47, 49, 319 N.E.2d 603, 604 (1974); *Michell v. General Motors Corp.*, 439 F.Supp. 24, 27 (N.D.Ohio 1977) (interpreting the Ohio choice of law rule as requiring application of "the substantive law of the place of the injury

absent compelling governmental interests to the contrary," *id.*); *Kliner v. Wierton Steel Co.*, 381 F.Supp. 275, 277 (N.D.Ohio 1974) (applying Ohio choice of law rules, and determining that *lex loci delicti* would be applied where competing governmental interests balance.)

In the present case, the Court has carefully considered the information submitted, including Defendant's affidavits and exhibits, which indicate that Plaintiff now has substantially lessened its business interests in this judicial district. However, Ohio is clearly the place of the injury which has been allegedly caused to Plaintiff's business, and in addition, Ohio's governmental interest has been increased by Plaintiff's choice of it as the forum state. *See, Schiltz v. Meyer*, 29 Ohio St.2d at 171–172, 280 N.E.2d 927. Although California has an undeniable interest in regulating the conduct of corporations domiciled therein, Ohio has a similar interest in supervising the activity of corporations which enter this state to transact business. Therefore, given the above factors, which weigh in favor of the application of Ohio law, this Court would conclude, if such a decision were presently necessary, that on the basis of the information which has been supplied, Ohio law would govern the tort claims which have been advanced by Plaintiff.

failed to demonstrate that California law is unclear, unsettled, or difficult, and has not furnished any reason, other than the mere applicability of law foreign to this Court, which would indicate that a transfer on the basis of the applicable state law would be justified. Accordingly, the Court cannot conclude that the necessity for applying California law is a factor which requires that this action be transferred to the Central District of California.

V. CONCLUSION

Based on the preceding analysis, which indicates, in short, that Defendant has failed to meet its burden of establishing that transfer of this action to the Central District of California would be warranted for the convenience of the parties and witnesses, and in the interest of justice, the Court finds that Defendant's Motion to Transfer must be, and hereby is, denied.

Counsel listed below will take note that a preliminary pretrial conference will be had, *by conference call telephone communication*, at 4:30 p. m. (Dayton time) on Tuesday, March 9, 1982, for the purpose of discussing, *inter alia*, the setting of discovery timetable and cut off date, a trial date, etc.