**NATIONAL PATENT DEVELOPMENT CORPORATION, and NPDC Epic Systems, Inc., Plaintiffs,**

v.

**AMERICAN HOSPITAL SUPPLY CORPORATION, Defendant.**

No. 84 Civ. 3411 (EW).

United States District Court, S.D. New York.

Nov. 21, 1984.

---

Winer, Neuburger & Sive, P.C., New York City, for plaintiffs; Mark A. Chertok, New York City, of counsel.

Walsh & Frisch, New York City, for defendant; Jerome K. Walsh, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is another case where an inquiry propounded by this Court more than thirty years ago is still appropriate: "must the race necessarily be to the swift in a matter so involved and requiring extensive activity on the part of the respective parties?"[1] This action was commenced on May 15, 1984 by National Patent Development Corporation and its wholly owned subsidiary, NPDC Epic Systems, Inc., (collectively "National Patent" or "National") against American Hospital Supply Corporation ("American Hospital" or "American"). Several days earlier, American Hospital had instituted an action against National Patent in the Superior Court of the State of California for the County of Orange, which was removed to the United States District Court, Central District of California (the California action).[2] American Hospital now moves to stay this action pending determination of its California action or, alternatively, to transfer this action pursuant to 28 U.S.C. § 1404(a) to the District Court of California. National Patent cross-moves to stay the California action pending determination of this action, opposes American Hospital's section 1404(a) motion, and moves for partial summary judgment.

The plaintiffs herein are both Delaware corporations having their principal places of business in New York County, in the Southern District of New York. The defendant, American Hospital, is an Illinois corporation with its principal place of business in Evanston, Illinois, but much of its business is conducted through separately organized divisions, including McGaw Laboratories Division ("American McGaw"). American McGaw is engaged in manufacturing and distributing parenteral solutions, medical devices, and biomedical equipment, and its principal offices are located in Irvine, Orange County, California.

The claims advanced by both parties in their respective actions arise under a distribution and licensing agreement that they or their affiliated or predecessor compa-

1. *Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*, 11 F.R.D. 156, 158 (S.D.N.Y.1951); *cf. Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 185, 72 S.Ct. 219, 222, 96 L.Ed. 200 (1952).

2. 28 U.S.C. § 1441 (1983).

nies[3] entered into on October 5, 1979. In part, that agreement concerned the Epic[R] I.V. Flow Controller (the "Flow Controller"), a patented and trademarked device designed to control electronically the flow of fluids injected intravenously into patients. An important and integral part of the Flow Controller's design is an alarm system designed to signal when the flow rate of the fluid is too low or too high. The Flow Controller is also designed for portable use on intravenous poles and may be operated on battery as well as direct current. The Flow Controller, together with certain patented ancillary equipment used to administer the fluid (the "Administration Set"), comprise the "Epic System." Under the agreement, National granted American the exclusive right to sell the Flow Controller, the nondisposable hardware component of the Epic System, as well as the exclusive right to manufacture and distribute the Administration Set, the disposable component of the system. In return, American agreed to purchase a minimum of 4,000 Flow Controllers within a five-year period commencing when the product was first made available to it.[4]

Shipments of Flow Controllers by National to American commenced in early 1980. After some initial difficulties, hereafter discussed in greater detail, full-scale marketing was undertaken by American in about July 1980. However, soon thereafter, American suspended sales for a period allegedly because of complaints by various hospitals about malfunctioning alarm systems and other defects in the Flow Controllers. These alleged shortcomings were to be corrected by National either by a design modification or by retrofitting the Flow Controllers with additional components. American continued, despite continued problems with the product, to order and market the product in reliance upon National's assurances. In all, the total

number of Flow Controllers shipped to and purchased by American up to December 1983 was 2,784. At that time, American advised National that it refused to purchase the additional 1,216 Flow Controllers as required under the contract. The parties then endeavored but failed to compromise their differences, following which the race to the courthouses began.

On May 11, 1984, American filed its summons and complaint in the Superior Court of California, Orange County. Copies were airmailed on May 14 to National's designated statutory agent for service who received them on May 17 and then forwarded the process to National, which did not receive it until May 21, 1984. In the meantime, on May 15, National commenced this action by filing its summons and complaint, personal service of which was made upon American on May 18 at its principal office in Evanston, Illinois.

There can be no doubt that whatever the parties' contentions under their variously pleaded claims, counterclaims, and defenses in their respective actions, all issues center about their distribution and license agreement. The essence of American's claim is that the Flow Controllers it received from National and later sold to hospitals as a component of the Epic System were defective; that National, when notified of the alleged deficiencies, undertook to correct and render marketable the Flow Controllers, upon which American relied in making further sales; that in fact National failed to remedy the defects in the Flow Controllers so as to render them marketable and has refused to do so; and that National was given timely notice by American of the breach of the agreement, which justified American's refusal to accept the balance of the Flow Controllers.

National, on the other hand, contends that it manufactured the Flow Controllers

---

3. The contract was entered into by American through its American McGaw division and by National through its subsidiary, Burron Medical Products, Inc. ("Burron"). Burron was later renamed NPDC Epic Systems, Inc. For convenience, the plaintiff corporations, as well as

Burron, are referred to as "National" or "National Patent."

4. The "First Contract Year" was defined as beginning "when the product is made available to the entire McGaw sales force."

pursuant to specifications approved by American; that American manufactured the Administration Sets, which were sold for use with the Flow Controllers; and that any failure of the complete Epic System to function properly was caused solely by American's failure to exercise reasonable care in manufacturing the Administration sets and testing the system as a whole, or by American's failure to give proper instructions as to the care and usage of the system. National further contends that despite American's current allegations of defects in the Flow Controllers, American did not give due notice of any claimed breach of warranty, express or implied; and that, with one exception noted hereafter, American did not assert any claims until December 1983, when National charged American with repudiating the agreement by failing to accept the balance of the 4,000 Flow Controllers. National asserts that until this time, the only notice of any claimed defect in the Flow Controllers it received from American was in early 1980; that this defect involved an electronic "chip" that was corrected at no cost to American; and that American approved the resultant modification in about July 1980 when it undertook full-scale marketing of the product.

Thus, the basic issues are whether the Flow Controllers delivered to American McGaw were defective in design and manufacture; whether the alleged defects rendered them unmarketable and unfit for their intended use; whether National represented that the claimed defects could be cured and American continued to order and market the Flow Controllers in reliance upon that representation; whether the defects constituted a breach of National's obligation under the agreement, thereby relieving American of its obligations under the agreement; and whether American gave timely notice of the claimed defects to National or first advanced its claims in December 1983, when National charged that American had repudiated the agreement by failing to accept the balance of the 4,000 Flow Controllers. It is not open to dispute that all issues, whether advanced as claims, counterclaims, or affirmative defenses, can be resolved in either this or the California action or that a final judgment in either action would be conclusive upon all litigants. The evidence, testimonial and documentary, in support of the parties' respective claims cannot differ from action to action.

Initially, each party argues that its action was commenced first and therefore the second action, that of its adversary, should be stayed pending the disposition of its, the first, action. Each relies upon the general policy that where two actions embrace the same issues, as a matter of sound judicial administration, the first action should have priority absent special circumstances supporting a different result.[5] The parties appear to recognize that more important than the claimed temporal priority of their respective actions is whether special circumstances displace the general rule.

American presses upon the Court that its California action, filed on May 11, is the "first filed" and thus is entitled to priority and a stay of this action. National, while perforce acknowledging that in point of time American's lawsuit was filed prior to this action, disputes that the California suit legally is the "first filed." It contends that American's filing was defective because American's complaint referred to exhibits that were not attached and that National did not receive until June 4, 1984, and that in personam jurisdiction in the California action initially[6] was not acquired over it. Specifically, National asserts that mail service upon its statutory agent was ineffec-

**5.** *Meeropol v. Nizer,* 505 F.2d 232, 235 (2d Cir. 1974); *William Gluckin & Co. v. International Playtex Corp.,* 407 F.2d 177, 178 (2d Cir.1969); *Mattel, Inc. v. Louis Marx & Co.,* 353 F.2d 421, 423 (2d Cir.1965), *petition for certiorari dismissed,* 384 U.S. 948, 86 S.Ct. 1475, 16 L.Ed.2d 546 (1966); *Remington Prods. Corp. v. American Aerovap, Inc.,* 192 F.2d 872, 873 (2d Cir.1951).

**6.** National concedes that American eventually effected proper service on June 22, 1984, after learning that National had moved to dismiss the California action upon the ground that initial service had not been properly made.

tive because the agent did not execute the essential acknowledgement of receipt and that the agent's lack of acknowledgement was proper in view of the missing exhibits. National further asserts that even if its receipt of the summons and complaint from the agent on May 21 is deemed effective service upon it, it had already filed its complaint in this Court on May 15 and effected service upon American on May 18, whereupon this Court became the first court to acquire personal jurisdiction in this litigation. Accordingly, National urges that it is entitled not only to remain in this district but to an order enjoining American from proceeding with its California action.

▇ These highly technical positions with respect to the "first filing" must yield to the realities of the situation in terms of the interests of the parties and effective and sound judicial administration. First, the contention that the omission of exhibits referred to in a complaint voids the commencement of the action is dubious to say the least. This view would exalt substance

over form. So, too, whether the "first filed" action is determined by the date of filing of the complaint or by the date of actual service of process,[7] temporal precedence is but a factor to consider and is not controlling. It is clear that in our circuit the "first filed" rule "is not to be applied in a mechanical way regardless of other considerations."[8] And the Supreme Court has observed that "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems" but is left to the sound discretion of trial judges.[9] In the instant situation where each side, after a breakdown in settlement negotiations, engages in a race to the courthouse to achieve "first filed" status, the courts should be concerned with what the interests of justice require and not with who won the race.

Essentially the same factors that are of significance on a motion to stay a "second filed" action come into play on a motion to transfer under section 1404(a).[10] Thus, the

---

7. There is some support for National's position that jurisdiction over the person rather than the filing of the complaint is controlling for purposes of determining priority, but this issue has not been definitively decided in this circuit. The Third Circuit appears to be unequivocal in its adherence to the rule that jurisdiction must be acquired over the parties before a case may be considered "first filed." See Crosley Corp. v. Westinghouse Elec. & Mfg. Co., 130 F.2d 474, 475 (3rd Cir.), cert. denied, 317 U.S. 681, 63 S.Ct. 202, 87 L.Ed. 546 (1942); Omni-Exploration, Inc. v. McGookey, 520 F.Supp. 36, 37 (E.D.Pa. 1981); Berkshire Int'l Corp. v. Marquez, 69 F.R.D. 583, 586 (E.D.Pa.1976); cf. Jefferson Ward Stores, Inc. v. Doody Co., 560 F.Supp. 35, 37 (E.D.Pa.1983) (citing Omni-Exploration). The Ninth Circuit takes the opposite view. Pacesetter Systems, Inc. v. Medtronic, Inc. 678 F.2d 93, 96 n. 3 (9th Cir.1982). The Second Circuit has ambiguously stated the rule as follows:

> The bulk of authority supports the position that when a case is brought in one federal district court, and the case so brought embraces essentially the same transactions as those in a case pending in another federal district court, the latter court may enjoin the suitor in the more recently commenced case from taking any further action in the prosecution of that case.... This necessarily follows from the basic proposition that the first court to obtain jurisdiction of the parties and of the

issues should have priority over a second court to do so.

National Equip. Rental, Ltd. v. Fowler, 287 F.2d 43, 45 (2d Cir.1961) (citations omitted). The district courts of this circuit have stated that "[a]bsent exceptional circumstances, the federal court first seized of an action should be the one to adjudicate it," Commerce & Indus. Ins. Co. v. Cablewave, Ltd., 412 F.Supp. 204, 207 (S.D.N.Y. 1976) (Frankel, J.), and that "service of process" is at least a fact of "slight relevancy," Brierwood Shoe Corp. v. Sears, Roebuck & Co., 479 F.Supp. 563, 568 (S.D.N.Y.1979); see also Columbia Pictures Indus., Inc. v. Schneider, 435 F.Supp. 742, 748 (S.D.N.Y.1977) (doubts concerning lack of personal jurisdiction in first filed action require stay of that action), aff'd, 573 F.2d 1288 (2d Cir.1978) (mem.).

8. Hammet v. Warner Bros. Pictures, Inc., 176 F.2d 145, 150 (2d Cir.1949); see also International Playtex, 407 F.2d at 179 (an "inflexible" approach is to be avoided); National Equip. Rental, 287 F.2d at 47 (Lumbard, C.J., concurring in part and dissenting in part).

9. Kerotest Mfg., 342 U.S. at 183, 72 S.Ct. at 221.

10. See International Playtex, 407 F.2d at 178; Louis Marx, 353 F.2d at 424; National Equip. Rental, 287 F.2d at 47 (Lumbard, C.J., concurring in part and dissenting in part).

instant motions to stay the action and to transfer it to California may be considered together. Among the factors to be considered are the convenience of the parties; the convenience of their witnesses; whether nonparty witnesses are subject to the subpoena power of the court insofar as their live testimony is more desirable than their deposition testimony; the availability of documentary evidence; the relative burdens of expenses on the parties; and the degree of interruption with executives' functions insofar as their testimony is required or desirable upon the trial proper.[11] Each party contends that regardless of the "first filed" issue, the balance of these and other factors[12] sustains its claim to remain in the district where it filed suit and to stay the action filed by its adversary. In urging its position, each side engages in head-counting of party and nonparty witnesses and emphasizes document availability, the burden of travel, hotel, and other expenses, and, finally, the interruption of its executives' daily functions.

■ At the outset American urges that although National maintains its corporate headquarters in New York City, in fact, there is little or no connection between the issues arising under these actions and the State of New York and notes that the contracts were signed by the parties in Evanston, Illinois, where American has its principal place of business. In response, National emphasizes that the distribution and licensing agreement provides that New York law "shall govern this agreement."

This provision recites only the parties' choice of governing law and may not be read as a forum-selection clause.[13] As such, it is of minor importance on this motion. Although a court's familiarity with the governing law is one factor to be considered on a motion to change venue,[14] that factor is by no means controlling and is entitled to little weight in cases where, as here, the governing law presents no complex legal questions and has not been shown to be unclear, unsettled, or difficult.[15] Whether New York or California law applies, this case will be decided primarily under the Uniform Commercial Code, which has been adopted in both states. Furthermore, the force of the parties' distribution and license agreement that New York law shall govern is attenuated by their simultaneously executed guaranty agreement which provides that the latter shall be governed by Illinois law. More important than the weight to be given to the governing law under the separate agreements are the factors already referred to, which we now consider.

■ A prime issue is whether, as American alleges and National denies, the Flow Controllers delivered to American for use as a component of the Epic System and thereafter sold to hospitals were defective and unfit for their intended use. The Flow Controllers were manufactured and assembled by National in plants located in New Jersey, Pennsylvania, and Connecticut and delivered to American's McGaw division in

11. See Schneider v. Sears, 265 F.Supp. 257, 263 (S.D.N.Y.1967).

12. See id.

13. Compare Coface v. Optique Du Monde, Ltd., 521 F.Supp. 500, 506 (S.D.N.Y.1980) (contractual provision stating that defendants "consent to the jurisdiction of the State and Federal courts sitting in New York" construed as consent to both personal jurisdiction and venue).

14. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (forum non conveniens); Allied Int'l Prods., Ltd. v. Textron Indus., Inc. 382 F.Supp. 210, 213 (S.D.N.Y.1974).

15. See Busch v. Sea World of Ohio, 95 F.R.D. 336, 341 (W.D.Pa.1982); Dow Jones & Co. v. Board of Trade, 539 F.Supp. 190, 192 (S.D.N.Y. 1982); Vasallo v. Niedermeyer, 495 F.Supp. 757, 760 (S.D.N.Y.1980); see also Van Dusen v. Barrack, 376 U.S. 612, 645, 84 S.Ct. 805, 823, 11 L.Ed.2d 945 (1964) ("[T]o the extent that Pennsylvania laws are difficult or unclear and might not defer to Massachusetts laws, it may be advantageous to retain the actions in Pennsylvania where the judges possess a more ready familiarity with the local laws."); AMF, Inc. v. Computer Automation, Inc., 532 F.Supp. 1335, 1346–48 (S.D.Ohio 1982) (applicability of California law does not require transfer where movant failed to demonstrate that law is unclear, unsettled, or difficult).

Irvine, California (with the exception of some that were shipped directly to hospitals) where American's personnel tested and found the defects complained of and made efforts to correct them. American asserts that the records which note the defects, as well as customers' complaints of defects and malfunctioning of the delivered product, are maintained in California; and that its witnesses who have knowledge of the test results, design and manufacturing defects, and efforts to correct them include current officers and employees, as well as three former employees, all of whom reside in the area of the California court. As to current officers and employees, it is not disputed that their testimony will be available no matter where the trial is conducted, but American argues that to bring these witnesses and the documents reflecting customer satisfaction and the results of its testing of the Flow Controllers to New York would involve substantial expense for transportation, hotels, and meals and loss of time from the witnesses' normal duties. As to the three former employees, American asserts it has no assurance they will voluntarily appear at a trial in this district and hence their testimony is available only by way of deposition. In sum, recognizing that one side or the other will suffer greater inconvenience depending upon where the trial is conducted, American urges that the relative inconvenience upon it would be greater in this district because a trial here "will require almost all witnesses to be away from home overnight, while in California at least American's employees will be within easy reach of the courthouse."

National contends, on the other hand, that it will be unduly burdened if the trial is conducted in California whereas a lesser burden will be cast upon American if the trial is conducted in this district—a contention based primarily upon the location of party and nonparty witnesses and their availability to testify at a trial in this district.

National asserts that practically all its witnesses, party and nonparty, as to negotiations leading to the contract, as to the issue of design, engineering, and market-ing of the Flow Controllers in 1981 and 1982, and thereafter as to complaints received from hospitals and the correction of defects, are located in the Northeast area, in the states of New Jersey, Pennsylvania, and Connecticut, within reasonable proximity to this Court; and that most nonparty witnesses are subject to the subpoena power of this Court. National also emphasizes that it maintains facilities in New Brunswick, New Jersey and Dayville, Connecticut where tests were performed and where records pertinent to the issues to be tried are maintained, as they are at its office in New York City. Further, National asserts that as to nonparty material witnesses, it has no assurance they will voluntarily travel to California and, even if they agreed to do so, such travel would involve undue expense for their transportation and maintenance; that as to its current officers and employees, a trial in California would not only involve additional expense but would seriously interfere with their daily activities at the three locations referred to above. Two nonparty witnesses who reside in the Northeast area have submitted affidavits indicating their reluctance to travel to California and as for the others there is no indication they will voluntarily appear at a trial in California. The subject of their testimony, relevant to the basic issues adverted to above, also is pertinent to National's claims under its motion for summary judgment, hereafter denied, whereas there is no indication that American's nonparty witnesses have information deemed necessary to support American's opposition to those claims.

National stresses that the complaints as to the malfunctioning of the Epic System were received from hospitals throughout the country but mostly from those in the Northeast, and that more than fifty percent of the total came from Maimonedes Hospital located in New York City. To give force to its position, National points out that only 2.5% of the complaints came from hospitals in California. Both sides agree upon the desirability of the live testimony of hospital officers and employees on

this important issue. As to documents reflecting hospital complaints and the results of tests, both sides have overemphasized their relative importance and the inconvenience that would result if production were requested at a trial or in pretrial discovery proceedings. The documents can readily be reproduced by one or more well-known processes.

The foregoing claims that each party has advanced in support of its own, and in opposition to the other's, position cannot be quantified with exactitude. While the issue is close, upon a consideration of the applicable criteria and bearing in mind that the burden is upon the movant to make a clear showing that the proposed transferee district is a more convenient one and that the interests of justice would be better served by a trial there,[16] I am persuaded that the balance tilts in favor of National. Accordingly, American's motion to stay this action pending final determination of its California action is denied, as is its alternative motion to transfer this action to California. National's cross-motion to stay the California action is granted.

We now address National's motion for partial summary judgment upon its first claim and for dismissal of American's defenses thereto and related counterclaim. Here, National seeks judgment against American in the sum of $260,000. representing damages for its failure to purchase 2,784 Flow Controllers, the balance of the 4,000 it contracted to buy. National argues that American acknowledged its liability to purchase these units even after it knew what is now asserted were defects in those previously delivered and distributed to hospitals; that the only time American ever claimed a breach of warranty was in March 1980 following which National corrected the product and American agreed to the specification that resulted in the correction; that thereafter American continued its normal marketing campaign of the Epic System; and that except for the March

1980 notice, no other notice of alleged defects or claims of breach of warranty was given by American to National until the onset of this litigation. National makes the further argument that the communications, written and oral, by American merely presented "problems" with delivered units and did not constitute notice of any claimed breach of warranty. Accordingly, National asserts that American cannot maintain an action for breach of warranty, express or implied.

 American in opposition asserts that it gave notice to National of defects in the delivered Flow Controllers which violated National's express warranty under the distribution and license agreement that the product would comply with specifications; that such notice indicated a breach by National of its warranty; and, further, that National undertook to make corrections to satisfy the warranty and gave assurances that the defects had been corrected and the Flow Controllers rendered marketable, and that upon such assurances American distributed the product with the administrative component only to have customer hospitals return it as defective. Affidavits submitted on behalf of American give support to this position. Whether the notification given to National merely presented a "problem" or was timely and sufficient to inform it that American was asserting a breach is clearly an issue of fact that precludes summary judgment under Rule 56.[17] So, too, National's additional ground for judgment without a trial must fail. This ground is based upon a contention that American had tested the Flow Controllers prior to entering into the contract and was responsible, together with National, for the specifications pursuant to which the units were manufactured. The issue is not American's knowledge in the area of medical devices and biomedical supplies or its pretesting of the product during the developmental stage but whether the delivered

---

16. *See Schneider,* 265 F.Supp. at 263; *see also, EMI, Ltd. v. Picker Int'l, Inc.,* 565 F.Supp. 905, 906 (S.D.N.Y.1983).

17. *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975).

units conformed to the specifications set forth in a schedule attached to the contract, which National warranted. If they did not conform, American had the right to return deliveries for full credit. In view of the conflicting affidavits, this issue cannot be decided under the summary judgment rule. Accordingly, National's motion for summary judgment is denied.

So ordered.