**ONTEL PRODUCTS, INC., d/b/a Pet & Groom, Plaintiff,**

**v.**

**PROJECT STRATEGIES CORP. and Stephen Ziskind, Defendants.**

**No. 94 Civ. 9025(HB).**

United States District Court, S.D. New York.

Sept. 14, 1995.

Kenneth R. Umans, Colucci & Umans, New York City, for Plaintiff.

Charles P. Kennedy, Jonathan A. David, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendants.

## OPINION AND ORDER

BAER, District Judge.

### I. FACTS

Defendant Project Strategies Corporation ("P.S.C.") sells a pet grooming device that it advertises through various media including television. The product is the "pet mitt" that enables pets to be groomed by a glove that pulls off loose hair from the pet. It packages this product with a label that reads "As Seen On TV." P.S.C. is incorporated in and has its only place of business in Florida. It discovered that plaintiff Ontel Products ("Ontel"), which has its principal place of business in New Jersey, was selling a different pet grooming device with the claim that it is "Similar To Those Seen On TV."[1]

P.S.C. informed Ontel that because Ontel does *not* advertise its own pet grooming device on television, Ontel's packaging violates P.S.C.'s rights. Ontel, meanwhile, informed P.S.C. that P.S.C. was harming Ontel's sales of its product by creating the allegedly incorrect impressions to market participants, through advertising, threatened lawsuits, and other means, that (1) Ontel's product violates a P.S.C.-owned patent, and (2) Ontel's use of the "Similar To Those Seen On TV" phrase on its packaging infringes P.S.C.'s rights. The parties entered settlement negotiations, but while the negotiations were ongoing, P.S.C. claims that Ontel filed the instant suit in order to choose the venue of the Southern District of New York rather than the District of New Jersey where P.S.C. could be expected to file a lawsuit if settlement did not transpire.

Ontel filed this action for a declaratory judgment holding that the packaging of its pet grooming device did not infringe P.S.C.'s rights. In addition, Ontel seeks damages for anti-trust violations, unfair competition, false advertising, various commercial torts, and illegal patent marking, and requests an injunction enjoining defendants, *inter alia,* from

> [i]nterfering with [Ontel's] existing or potential contracts to sell pet mitt product[s] by implying to [Ontel's] suppliers and/or potential suppliers, customers, potential customers and/or to the trade or consuming public that [Ontel's] pet mitt products are somehow illegal, or not totally free to be sold without authorization of [P.S.C.]....

Am.Compl. ¶ 4(e).[2] Later that same day, P.S.C. filed a suit in the District of New Jersey alleging violation of the Lanham Act and seeking damages. P.S.C. brought the instant motion to (1) dismiss Ontel's suit for lack of personal jurisdiction or improper ven-

---

**1.** The reproduction of its product packaging that Ontel provided to the Court, however, indicated that the packaging bore the phrase "Similar To As Seen On TV." Am.Compl.Ex. E.

**2.** In its amended complaint, Ontel added individual defendant Stephen Ziskind, who is the CEO, President, and 100% shareholder of P.S.C. The parties agreed to include with the instant motion P.S.C.'s claim that the suit should be dismissed as to Stephen Ziskind due to lack of personal jurisdiction or improper venue.

ue; (2) transfer for *forum non conveniens* to the District of New Jersey; or (3) dismiss the action, or stay it pending disposition of the District of New Jersey proceeding.

For the reasons below, P.S.C.'s motions are granted in part and denied in part. I conclude that the dispute should be resolved here. The parties are therefore enjoined from pursuing the District of New Jersey action, which action has been held in abeyance by the District of New Jersey pending resolution of the instant motions.

## II. DISCUSSION

### A. Personal Jurisdiction

#### 1. P.S.C.

▇ The extent to which P.S.C. "does business" in New York State subjects it to personal jurisdiction here pursuant to N.Y.Civ.Prac.L. & R. ("CPLR") 301.[3] P.S.C.'s transaction of business here includes, among other activities:

(i) an ongoing relationship with Just Packaging, Inc. (which is located in the Eastern District of New York), an independent New York packaging and distribution center that receives the pet grooming mitts from abroad, repackages them, and ships them out to fulfill 80% of P.S.C.'s orders from within and without New York State, Pl.'s Mem.L.Opp'n at 5–6 (citing Decl. of Def. Ziskind);

(ii) a contract with a Manhattan based company, Media Syndication Group (MSG) (which is located in the Southern District of New York), giving it exclusive print media advertising and corresponding distribution rights. MSG purchases pet mitts from the Hong Kong manufacturer and P.S.C. receives commissions on MSG's purchases; and

(iii) a relationship with Emson, a Manhattan based distributor (which is located in the Southern District of New York), whereby P.S.C. has granted Emson the right to sell to retail markets that P.S.C. has chosen not to service directly.

Although Just Packaging, Inc. is an independent contractor, personal jurisdiction over P.S.C. can nonetheless result from this relationship alone. Where New York contacts are such that local representatives— even non-agents—do all that a foreign defendant would do by its own officials if it were in New York, personal jurisdiction can be invoked. *See, e.g., Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116 (2d Cir.1967), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968); *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). In practice, this means that the local entity must represent "so significant a portion of [the] business that the non-resident would have to dispatch its own employees to [the] State were its affairs not conducted on its behalf." *Pneuma–Flo Sys., Inc. v. Universal Mach. Corp.*, 454 F.Supp. 858, 865 (S.D.N.Y. 1978) (citations omitted). As indicated above, by their own estimate, defendants acknowledge that fully eighty percent of all nationwide orders are fulfilled by Just Packaging, Inc. If P.S.C. did not retain Just Packaging, Inc. to do so, P.S.C. would no doubt have to dispatch its own employees to perform these packaging and distribution activities.

#### 2. Stephen Ziskind

Ontel states that Stephen Ziskind is the "founder, CEO, President and owner of 100% of the capital stock" of P.S.C., Pl.'s Letter Br. at 2, and characterizes Ziskind's deposition testimony as relating that he "was and continues to be the sole driving force behind the activities that stand as the basis for this" lawsuit, *id.* Ontel concludes that Ziskind's activities in connection with New York give this Court jurisdiction over him pursuant to New York's long-arm statute, CPLR 302(a). Defendants, meanwhile, argue that Ziskind "should ... be dismissed from this action since his actions relating to Ontel's claims were conducted on behalf of [P.S.C.] solely in his corporate capacity." Defs.' Letter Br. at 3.

---

**3.** In contrast to CPLR 302, CPLR 301 is not concerned with whether the cause of action allegedly arose from the defendant's New York contacts; CPLR 301 governs "general" jurisdiction, whereas CPLR 302 addresses "specific" jurisdiction.

In New York, the individual who owns a corporation is generally not subject to personal jurisdiction as a result of the corporation's activities unless (1) the corporate veil can be "pierced" or (2) the corporation acted as an agent for the owner. *Lamar v. American Basketball Ass'n,* 468 F.Supp. 1198, 1203 (S.D.N.Y.1979). An individual, such as a corporate officer or employee, however, cannot avoid jurisdiction on the basis that he or she engaged in the offending activity solely in the context of his or her corporate capacity. *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 202, 522 N.E.2d 40, 47 (1988).

Ontel proclaims that it "believes ... Mr. Ziskind has clearly formed the corporation for his own wrongful gain," Pl.'s Letter Br. at 5, while defendants note that "[t]he mere fact that a corporation consists of a 'one person' corporation [sic] does not alone justify piercing the corporate veil," Defs.' Letter Br. at 3 (citation omitted). Under Florida law, which controls this question,[4] piercing the veil requires more than mere conjecture on the plaintiff's part; before a corporation's owners can be required to demonstrate proper maintenance of the corporate form, the plaintiff must make:

> a preliminary showing "that the corporation is in actuality the alter ego of the stockholders and that it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes, or in some fashion that the corporate property was converted or the corporate assets depleted for the personal benefit of the individual stockholders, or that the corporate structure was not bona fidely established or, in general, that property belonging to the corporation can be traced into the hands of the stockholders."

*Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1120 (Fla.1984) (quoting *Adver-*tects, *Inc. v. Sawyer Indus., Inc.,* 84 So.2d 21, 24 (Fla.1955)). *Accord Lamar,* 468 F.Supp. at 1204 n. 9 (rejecting an effort to pierce a corporate veil where the only evidence plaintiff presented consisted of requests to the court to take "notice of the generally accepted intelligence that the various entities which have been created to enclose [the owner's] activities ... are no more than [the owner's] alter egos and have no independent existence for contractual purposes separate and apart from [the owner]" (quoting plaintiff's att'y's aff.)). Ontel fails to provide any support for its naked statement that Ziskind "clearly formed the corporation for his own wrongful gain," and I will therefore not find that Ziskind is subject to this Court's jurisdiction by virtue of his supposed abuse of the corporate form.

Ontel fails as well in establishing that P.S.C. does business in New York as Ziskind's agent. Ontel has not shown that P.S.C. acted in pursuit of Ziskind's business; rather, there is every indication that whatever activities Ziskind may have personally taken were to further P.S.C.'s business.[5] *See Lamar,* 468 F.Supp. at 1204 ("[I]t is not Buffalo Braves, Inc. which is in New York to do [the owner's] business, but rather [the owner] who has ... entered New York to do the corporation's business.").

Ontel cannot obtain personal jurisdiction over Ziskind based solely on his position as President of P.S.C.; instead, Ontel must show that Ziskind personally took part in the activities giving rise to the action at issue. *See Kinetic Instruments, Inc. v. Lares,* 802 F.Supp. 976, 984 (S.D.N.Y.1992) ("[T]he transaction at issue performed by the corporation ... must be with the knowledge and consent of the officer and the officer must have exercised control over the corporation in the transaction." (citation omit-

**4.** *See Kalb, Voorhis & Co. v. American Fin. Corp.,* 8 F.3d 130, 132–33 (2d Cir.1993).

**5.** For this reason, Ontel also cannot obtain jurisdiction over Ziskind pursuant to CPLR 301. *See also Laufer v. Ostrow,* 55 N.Y.2d 305, 449 N.Y.S.2d 456, 460–61, 434 N.E.2d 692, 696–97 (1982) (holding that the president of a corporation did "not subject himself, individually, to the CPLR 301 jurisdiction of our courts ... unless he is doing business in our State individually" (citations omitted)); *cf. ABKCO Indus., Inc. v. Lennon,* 85 Misc.2d 465, 377 N.Y.S.2d 362 (Sup.Ct. N.Y. County 1975), *aff'd,* 52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976) (finding individual defendant subject to personal jurisdiction in New York where he conducted his personal business in New York through agents).

ted)); *see also Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 201, 522 N.E.2d 40, 45–46 (1988) (distinguishing between exercising jurisdiction over an individual who was a "primary actor in the [corporate] transaction ... in New York ... [and an] employee in Texas who played no part in it"). The many contacts Ontel describes that Ziskind himself personally had, and may continue to have, with New York are irrelevant as to whether New York can exercise long-arm jurisdiction over him in connection with the dispute at issue.[6] Ontel has presented no evidence, nor even made any allegations, concerning Ziskind's personal involvement with the activities giving rise to this suit; Ontel has not asserted that Ziskind himself engaged in the following activities or directed that they be undertaken: communicating information about Ontel's alleged infringement to third parties, negotiating with Ontel regarding Ontel's alleged infringement, and creating the patent warning on P.S.C.'s packages. It is not enough that Ziskind, as President of P.S.C., likely *possessed authority* to direct all the activities that gave rise to this suit. If that were the case, the President of every company would be subject to jurisdiction in New York based on activities with which he or she had no personal involvement and over which he or she exercised no decisionmaking authority.[7] Accordingly, the action against Ziskind is dismissed for lack of personal jurisdiction.

### B. Venue

▮▮ Because P.S.C. is a corporation, venue is proper in the Southern District of New York pursuant to the federal venue statute, 28 U.S.C. § 1391. P.S.C.'s activities in the Southern District are such that, if the Southern District were a distinct state, P.S.C. would be subject to personal jurisdiction there in accordance with the New York State law of personal jurisdiction detailed in the previous section of this Opinion.[8] 28 U.S.C. § 1391(c).

### C. Transfer or Dismiss

▮▮ Defendants further argue that even if I were to find as to one or both of the defendants that this Court has personal jurisdiction and venue were proper here, this case should be transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a), where defendants filed their own action against plaintiff only hours after the instant action had been filed. Alternatively, defendants request that I dismiss or stay this action pending the outcome of the District of New Jersey suit. Defendants exhort,

> Ontel's obvious race to the courthouse door by filing suit during ongoing settlement negotiations should not be rewarded by this Court, since any potential plaintiff, as PSC, should be encouraged to enter into settlement discussions without fear that the defendant will use the opportunity to file a preemptive suit in a district of its own choosing.

Defs.' Mem.Supp. at 2. P.S.C. explains that its first communication to Ontel consisted of a letter informing Ontel of its allegedly unlawful activity and requesting Ontel's assurance that it would cease and desist from that activity. As P.S.C. points out, "We could have sued first and have sent the letter later, but we sent a letter in the hope of settling the dispute without involving a court." Kennedy Decl. ¶3. Ontel terms defendants'

---

6. As previously noted, *supra* note 5, because Ziskind performed his New York-related activities in his official capacity, he is not subject to CPLR 301 "general" jurisdiction on the basis of those activities.

7. Although not pertinent to the instant case, it is interesting to note that a claim could potentially be made against a corporate officer (or other high-ranking manager) who was negligent in circumscribing the activities of subordinates under his or her authority. Such a claim, however, of course differs from that being discussed here, for here we are concerned with whether a corporate President is subject to jurisdiction due to the alleged wrongdoing of those under his control, as opposed to the negligence the President may have exhibited in exercising, or not exercising, that control.

8. In ascertaining whether the corporate defendant would be subject to jurisdiction in the Southern District of New York if the Southern District were a separate state, as required by the venue statute, I proceed on the assumption that the law concerning personal jurisdiction that exists in New York State would be the applicable one in the "state" of the Southern District of New York.

statement "flatly wrong," detailing that "Ontel and PSC negotiated in *good faith* and settlement had clearly reached a terminal impasse before suit was filed." Pl.'s Mem. L.Opp'n at 23.

▮ Where lawsuits concerning the same parties and issues are pending in two federal districts, the first-filed rule of the Second Circuit generally affords priority to the first-filed suit when courts choose which suit to permit to go forward. *First City Nat'l Bank & Trust v. Simmons*, 878 F.2d 76, 79 (2d Cir.1989); *Meeropol v. Nizer*, 505 F.2d 232, 235 (2d Cir.1974). In so doing, the first-filed rule avoids duplicative litigation by adhering to the inherently fair concept that the party who commenced the first suit should generally be the party to attain its choice of venue. There are exceptions to this rule; one exception exists where the first-filed suit constitutes an "improper anticipatory filing," or one made under the apparent threat of a presumed adversary filing the mirror image of that suit in a different federal district (or state court). *800–Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128, 132 (S.D.N.Y.1994); *Don King Prods., Inc. v. Douglas*, 735 F.Supp. 522, 532 (S.D.N.Y.1990). These improper filings, by necessity, often take the form of declaratory judgments, which form the instant action in part takes. Because "[a] party has a right to seek declaratory [relief] where a reasonable apprehension exists that if it continues an activity it will be sued by another party," however, the mere fact that an action is brought as one for a declaratory judgment "does not necessarily [mean that it] constitute[s] an anticipatory filing for purposes of an exception to the first filed rule." *800–Flowers, Inc.*, 860 F.Supp. at 132. In the

instant case,[9] although the available evidence supports the proposition that Ontel filed this action in the Southern District of New York in anticipation of P.S.C. bringing suit elsewhere, it also indicates that Ontel's filing was *not* "improper."

Even if, as Ontel claims above, settlement discussions between the parties had reached a "terminal impasse," its immediate step in filing suit here can still constitute an improper anticipatory filing.[10] Ontel misunderstands the factors that render an anticipatory filing "improper." A filing in this context is improper where it attempts to exploit the first-filed rule by securing a venue that differs from the one that the filer's adversary would be expected to choose. Where a party is prepared to pursue a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary used the resulting delay in filing to proceed with the mirror image of the anticipated suit. Otherwise, potential plaintiffs would be discouraged from first attempting to resolve their claims without resorting to litigation. And as this Court commented almost two decades ago, due to "federal court calendars becom[ing] increasingly burdened, attorneys should exercise a correspondingly increased responsibility to attempt to resolve disputes without using limited judicial resources to decide issues which might, by responsible discussions between reasonable people, be settled out of court." *Columbia Pictures Indus., Inc. v. Schneider*, 435 F.Supp. 742 (S.D.N.Y.1977) (citation omitted), *aff'd*, 573 F.2d 1288 (2d Cir.1978). The existing state of federal court dockets indicates the continuing need to facilitate the

---

9. Case law indicates that the court in which the first-filed case was brought decides the question of whether or not the first-filed rule, or alternatively, an exception to the first-filed rule, applies. *Weber–Stephen Prods. Co. v. Ivy Mar Co., Inc.*, No. 93 C. 5462, 1994 WL 11711 (N.D.Ill. Jan. 13, 1994) (leaving application of the first-filed rule to the Southern District of New York where the first-filed case was brought); *Donaldson, Lufkin & Jenrette, Inc. v. Los Angeles County*, 542 F.Supp. 1317, 1321 (S.D.N.Y.1982) ("[T]he district court hearing the first-filed action should [be the court that] determine[s] whether special circumstances dictate that the first action be

dismissed in favor of a later-filed action."). As noted above, the first-filed case was brought here in the Southern District of New York, and thus I will now decide application of first-filed jurisprudence. The District of New Jersey accordingly has delayed any judicial action on the second-filed case, which was filed there, pending my decision on these motions.

10. Such circumstances actually *buttress* a finding that the filing was anticipatory in that Ontel was at that point practically assured that a P.S.C. suit was imminent as a result of the breakdown of settlement discussions.

attempts of potential plaintiffs to settle before initiating litigation. This could hardly be accomplished if such parties knew that by first attempting settlement they were risking the loss of the first-filed rule's benefit.

This is not to say that whichever party first expresses its desire to resolve an alleged claim outside of the courtroom should always benefit from the first-filed rule; that would simply change the proverbial "race to the courthouse" into the race to the post office, facsimile machine, or telephone, in which parties would, at the first sign of conflict, communicate their desire to resolve the conflict without involving the courts. Instead, as "second filers" are concerned, the first-filed rule should operate so as to benefit those parties who were prepared, and had every intention, to pursue foreseeable legal action but failed to bring suit first due solely to their attempt to settle the matter without court involvement.[11] In contrast, those "second filers" who refrained from suing due to any, or any combination, of the myriad of other factors that deter lawsuits, such as legal fees, court costs, process server expenses, the hope to avoid "raising the stakes" in the dispute, the desire not to appear unnecessarily litigious, and the uncertainty of the strength of one's claim, should not receive the benefit of the first-filed rule.

Furthermore, if, after settlement discussions have proven fruitless, the party that initially refrained from filing does not proceed to file suit promptly, its adversary could be justified in filing first. This justification would exist where a party " 'create[d] a controversy by making ... charges, but by withholding suit, ... prevent[ed] the other party from conclusively refuting them.' " *Columbia Pictures Indus., Inc.*, 435 F.Supp. at 747 (quoting *Topp–Cola v. Coca–Cola Co.*, 314 F.2d 124, 125 (2d Cir.1963)). An anticipatory filing there would *not* be "improper," and thus the first-filed rule would benefit the party that actually filed first, and not the party who delayed in bringing suit even after the settlement efforts it initiated had failed.

*Cf. Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F.Supp. 581, 586 (S.D.N.Y.1990) (dismissing the anticipatory filing where there was "no evidence that defendant Houston General had in any way slept on its rights against plaintiff so as to cause prejudice to plaintiff prior to the filing of the instant action"); *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 267 F.Supp. 938, 941–42 (S.D.N.Y.1967) (ruling that plaintiff who "outraced" defendant to the courthouse after failed settlement discussions was not entitled to first-filed priority).

Nor would an anticipatory filing be improper where the adversary was genuinely concerned with obtaining a benefit beyond the scope of what the other party could be expected to bring suit for. In *800–Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128 (S.D.N.Y.1994), for example, this Court adjudicated a first-filed dispute in which a party that had been accused of trademark infringement [12] brought suit for a declaratory judgment before its adversary brought an anticipated infringement suit. The Southern District of New York did not find the first-filed action to be an improper anticipatory filing, noting that the first-filer "contend[ed] it filed its action ... in response to the disparaging remarks made by [its adversary] to potential ... customers and with the hope of deterring unfair trade tactics." *Id.* at 133. "This indicate[d]," the Court explained, "that [the first-filer] had a legitimate and meritorious rationale for seeking a declaratory judgment, since a resolution of the infringement issue ... would benefit [the first-filer's] developing business." *Id.*

*Ivy–Mar Co., Inc. v. Weber–Stephen Prods. Co.*, No. 93 Civ. 5973, 1993 WL 535166, at *2 (S.D.N.Y. Dec. 22, 1993), involved a fact pattern even more similar to the instant case than *800–Flowers, Inc.* In *Ivy–Mar Co.*, the Southern District of New York considered whether a party accused of trademark and patent infringement had im-

---

**11.** Parties that employ the common settlement technique of providing an adversary with a drafted, but unfiled, complaint would clearly fall within this category. *See, e.g., Columbia Pictures Indus., Inc.*, 435 F.Supp. at 747.

**12.** The case refers to it as alleged infringement of mnemonic. *800–Flowers, Inc.*, 860 F.Supp. at 130.

properly brought an anticipatory action for a declaratory judgment. There, the party making the accusations of infringement had sent letters to customers of its adversary that claimed the adversary was engaging in infringement. Because the adversary proceeded to also pursue affirmative causes of action for libel and trade disparagement, and because the adversary had mentioned those other claims during the parties' settlement negotiations, the Court found its anticipatory filing "proper:" "[T]he fact that [plaintiff] threatened to pursue [other] such actions as early as December 1992 rebuts any implication that these actions were manufactured merely for the purposes of" exploiting the first-filed rule.

In the absence of evidence, or even allegations, that P.S.C. intended to unduly delay bringing its contemplated action, and even assuming that settlement had proven futile at the time Ontel asserts, Ontel's immediately filing suit precludes a finding that P.S.C. delayed—or planned to delay—initiating suit to the prejudice of Ontel. It would also appear that Ontel was genuinely pursuing relief beyond what P.S.C.'s suit could be expected to encompass. As indicated above, Ontel sought, *inter alia*, relief for P.S.C.'s allegedly unlawful employment of a patent warning, as well as for P.S.C.'s action in communicating its allegations of Ontel's unlawful activity to relevant third parties in the business community.

P.S.C. vigorously contests this impression, arguing that the several communications and proposed settlement agreements that P.S.C. and Ontel exchanged made no mention of any significant claims on Ontel's part. *See* Kennedy Supp.Decl. ¶ 3 ("Ontel's belated claim that it objects to the patent warning language on PCS's [sic] package was not raised in correspondence or mentioned at all in the draft Settlement Agreements for negotiating resolution of this matter. When Ontel's attorney mentioned this matter, I construed it to be a mere negotiating tactic."). Did Ontel "manufacture[ ]" its additional claims so that its anticipatory filing remained "improper?" P.S.C. appears correct in theorizing that if Ontel had been genuinely concerned with those claims, Ontel would have included them

in at least some of its correspondence, and would have demanded that the proposed settlement agreements address the matter. Ontel did verbally mention the claims during settlement negotiations, but acknowledged at supplementary oral argument that it never sought to incorporate them into the various forms of the settlement agreements. Ontel essentially agrees with P.S.C.'s characterization of Ontel's use of the claims as a bargaining chip, conceding that it would have abstained from pursuing the claims as long as P.S.C. refrained from pursuing its claim against Ontel. Ontel explained that this was because it was seeking "peace, not war," and was not being "aggressive."

Does the "manufactur[ing]" of claims, as criticized by *Ivy–Mar Co.*, encompass the pursuit of claims that the party would not have pursued had prior settlement efforts succeeded? I extend the holding of *800–Flowers, Inc.* while answering that question in the negative. As noted above, the Southern District of New York, in *800–Flowers, Inc.*, found that a party had a "legitimate and meritorious rationale for seeking a declaratory judgment" concerning a dispute concerning trademark infringement where that party simultaneously strove to "deter[ ] [the] unfair trade tactics" of its opponent communicating its alleged infringement to potential customers. In the instant case, even if the parties had settled, Ontel similarly possessed a "legitimate and meritorious rationale" for seeking the additional relief it requests here; the fact that Ontel admittedly would have exercised its prerogative not to pursue that relief had settlement transpired does not alter the facially meritorious nature of the corresponding claims. Indeed, it would seem precisely because settlement did not result that Ontel had reason to fear not only the continuation, but also the increase, of P.S.C.'s allegedly untrue disparaging comments to third parties in the business community. The concern that P.S.C. would continue contacting third parties constituted a genuine concern on Ontel's part and, much like that in *800–Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128 (S.D.N.Y.1994), warranted Ontel's request for the declaratory and injunctive relief it sought in order to protect its business. I

thus conclude that the instant case was not an improper anticipatory filing.

This, however, does not end the issue. Even though the instant action was not improper, and therefore can potentially benefit from the first-filed rule, that rule is usually disregarded where the competing suits were filed merely days apart. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). Here, because the lawsuits were both filed on the *same* day, the first-filed rule is inapplicable.

This Court has stated that even where a significant difference in timing of the suits' filings exist, "temporal precedence is but a factor to consider and is not controlling." *National Patent Dev. Corp. v. American Hosp. Supply Corp.*, 616 F.Supp. 114, 118 (S.D.N.Y.1984). The factors that also should be considered, the Court explained, are "[e]ssentially the same factors that ... come into play on a motion to transfer under [28 U.S.C. §] 1404(a)," which authorizes transfer "[f]or the convenience of parties and witnesses, in the interest of justice." I will therefore decide the question of which suit will proceed in the same manner I would adjudicate a transfer motion made pursuant to 28 U.S.C. § 1404(a) (which motion P.S.C. has also made).[13]

The various factors to consider in a 1404(a) motion include, among others, the convenience of the parties and witnesses, ease of access to sources of proof, plaintiff's choice of forum, local interest in the dispute, availability of process to compel unwilling witnesses, and the relative size of the dockets at the contemplated fora. *Elite Parfums, Inc. v. Rivera*, 872 F.Supp. 1269, 1271

(S.D.N.Y.1995). An interesting question arises as to whether the weight generally accorded plaintiff's choice of forum should be afforded in the instant situation where two lawsuits are pending in two different districts. One could conceive of the conflict that might result if both of the districts at issue afforded the respective plaintiff this weight towards its choice of venue: both districts might be correct in refusing transfer (assuming that the other transfer considerations in both cases did not outweigh the plaintiff's choice factor).[14] It is tempting to circumvent this potential difficulty by establishing the principle that the plaintiffs' choices of venue "cancel out" each other where multiple suits are pending in multiple districts. This approach appears analogous to the operation of the first-filed rule, which discounts time differences in filing where that difference is small. Although appealing, this proposed principle would encourage a defendant planning a 1404(a) motion to file suit in the proposed transferee district, and thereby increase the likelihood of its 1404(a) motion's success by neutralizing the prominent factor of its adversary's choice of venue in the original forum. Consequently, I find that this situation can be addressed fairly by adhering to the following principle: where suits are pending in different districts and the first-filed action is deemed *not* to be an improper anticipatory filing,[15] the court in which the first case was filed will decide which case will proceed and, in doing so, will afford the plaintiff in the first-filed case with the weight it would be provided in the typical transfer situation.

Here, P.S.C. has produced little support for its contention that for "the convenience of parties and witnesses, in the interest of justice," 28 U.S.C. § 1404(a), this dispute should

---

**13.** As indicated above, I will not consider the fact that Ontel filed first in this equation due to the negligible time difference involved.

**14.** Although the realization of this conflict generally would be avoided by the previously noticed convention that the court in which the first-filed case was brought should be the one that decides the transfer question in the context of the first-filed rule, it remains important to avoid the potential conflicting decisions in the manner detailed below in order to maintain the integrity of federal practice and procedure.

**15.** In cases where the first-filed action is determined to have resulted from an improper anticipatory filing, the suit will generally be dismissed in favor of the second-filed action; consequently, the question of transfer, if reached, would be adjudicated by the court in which the second suit was brought, which would likewise provide the plaintiff in the second suit with the weight normally accorded a plaintiff's choice of forum.

be resolved in the District of New Jersey. P.S.C. complains largely that the District of New Jersey would be more convenient to Ontel because Ontel's offices are located there, and argues that Ontel cannot rely on the New York location of its counsel as a factor supporting convenience in New York. That is true. However, it is also true that a party can waive its inconvenience by agreeing to venue in a district that actually is not the most convenient forum for it. In so doing, the party "remove[s] from the section 1404(a) balancing exercise [its] inconvenience that would otherwise support" its adversary's transfer motion. *See Williams v. National Hous. Exch., Inc.*, No. 95 Civ. 1594, 1995 WL 406271, at *3 (S.D.N.Y. July 7, 1995) (citation omitted). It is generally immaterial as to what motivates the party to waive its inconvenience. It could be because the party has relatives in the less convenient district, wants an excuse to travel to that district, or, as here, employs lawyers who are based in that district. *See* Pl.'s Mem.L.Opp'n at 23 (indicating that Ontel is motivated by "the need to avoid additional expenses of local counsel in New Jersey, in addition to wishing to retain its *long standing*, intellectual property counsel in New York. [Ontel] also want[s] to minimize the travel time and concomitant expense of its New York counsel.").

P.S.C. asserts that Ontel is not entitled to the substantial weight regularly afforded to the plaintiff's choice of venue, because of its claims that Ontel is not based in New York and this action bears little connection to the Southern District of New York. I find that this action does have substantial connections with the Southern District of New York. First, Ontel's product is advertised in the Southern District of New York; in fact, an Ontel advertisement that appeared in *The New York Times*, a newspaper distributed heavily throughout the Southern District of New York, precipitated this suit. Moreover, as indicated above, P.S.C. has a contract with Media Syndication Group, a company located in the Southern District of New York, that gives MSG exclusive print media advertising and corresponding distribution rights. Finally, Ontel's product is sold, among other places, through "retail stores many of which are within this judicial district," Pl.'s Mem. L.Opp'n at 26, as P.S.C.'s product is, Compl. ¶ 11. Given that Ontel complains of the damage to its sales caused by P.S.C.'s allegedly inaccurate statements concerning Ontel's product and because this action also concerns issues related to the permissible advertising of the two products and the consumer confusion that may result, I find that the Southern District does have a significant connection with the dispute. *Cf. Radical Prods., Inc. v. Sundays Distrib.*, 821 F.Supp. 648, 650 (W.D.Wash.1992) (finding, pursuant to 28 U.S.C. § 1391(b), that a "substantial part of the events or omissions giving rise to" a suit complaining of confusing trade dress occurred in the district where the allegedly infringing product was advertised even though that product had never actually been sold in the district).

P.S.C. does assert that the District of New Jersey would be more convenient for it than the Southern District of New York. P.S.C. is headquartered in Florida, and it is difficult to conceive of significant inconvenience P.S.C. would incur from litigating in the Southern District of New York that it also would not incur from a District of New Jersey case. P.S.C. explains that the District of New Jersey would be more convenient for it than the Southern District of New York because its President Ziskind "stay[s] with friends when [he is] in New Jersey[. I]t makes it much easier for [him]. [He has] much more occasion to go to New Jersey for things other than the Pet Mitt." Ziskind Dep. at 116–17. In addition, P.S.C. states that the District of New Jersey would be more convenient for it than even a federal court in Florida, because its "documents and ... attorneys are in New Jersey." *Id.* at 117–18. P.S.C. further states, "The fact that it is a short distance, as the crow flies, between Newark [where the District of New Jersey would hear this dispute] and Foley Square [16] [where the Southern District of

---

**16.** After the parties submitted their papers, the location of my Chambers and Courtroom changed from 40 Centre Street in Manhattan, next to Foley Square, to 500 Pearl Street in Manhattan. Because the two sites are roughly

New York is partially situated] does not lessen the desirability of a transfer. The difference represents a significant difference in travel time, particularly through the New York Metropolitan area." Defs.' Mem.Supp. at 15.

As for the convenience asserted by P.S.C. due to its President "stay[ing] with friends" in New Jersey, Ontel contends, "By no stretch of the imagination, can such social benefits be considered factors which would warrant a transfer." Pl.'s Mem.L.Opp'n at 26. As indicated above, Ontel can waive the otherwise more convenient forum of New Jersey due to the location of its counsel, and, by doing so, remove the inconvenience it otherwise would experience from the section 1404(a) balancing exercise. P.S.C., however, cannot claim that the district it wants to transfer to would be more convenient without substantiating that position. This prevents a party from effectively "creating" inconvenience and injecting a false factor into the section 1404(a) balancing exercise. In short, a party can waive the inconvenience it would otherwise experience, but a party cannot affirmatively assert inconvenience that it otherwise would not experience. As P.S.C. itself noted above, a party cannot rely on the location of its counsel as a factor impacting convenience (although as I explained above, a party can waive its inconvenience for virtually any reason, including the location of its counsel). And P.S.C.'s alleged decrease in inconvenience from litigating the issue in the District of New Jersey as opposed to the Southern District of New York is unavailing. As this Court explained years ago in refusing a transfer from this district to the District of New Jersey, "[I]t is difficult to imagine that there could be real inconvenience to the parties or witnesses." *Jenkins v. Wilson Freight Forwarding Co.*, 104 F.Supp. 422, 425 (S.D.N.Y.1952).

### III. CONCLUSION

The defendants' motion to dismiss for lack of jurisdiction and improper venue as to P.S.C. is denied; the defendants' motion to dismiss for lack of jurisdiction as to Ziskind is granted; and the defendants' motions to

50 yards apart, the move has no impact on the

transfer this suit to the District of New Jersey or dismiss or stay this suit pending the outcome of the District of New Jersey action all are denied. Accordingly, the parties are enjoined from prosecuting the District of New Jersey action. *See City of New York v. Exxon Corp.*, 932 F.2d 1020, 1025 (2d Cir.1991). The parties are directed to appear in Chambers, Room 2230, of the new United States Courthouse at 500 Pearl Street at 4:30 p.m. on September 27, 1995, where a pretrial scheduling order detailing discovery and the briefing of any remaining motions will be completed.

**SO ORDERED.**

issues under discussion.